# WASHINGTON SUBURBAN SANITARY COMMISSION
## v. ROBERT S. NASH ET AL.

[No. 83, September Term, 1978.]

*Per Curiam Order December 1, 1978.*

*Opinion Filed January 22, 1979.*

*Roger C. Duncan,* with whom was *Michael J. Walls* on the brief, for appellant.

*Amicus curiae* brief filed by Donald S. Nash, *J. Hampton Baumgartner, Jr., Alfred H. Carter, John F. McCabe, Jr.,* and *Wilkes & Artis* on the brief.

*Allen S. Handen,* with whom were *Robert L. Gray* and *Handen & Singerman* on the brief, for appellees.

ORTH, J., delivered the opinion of the Court.

The Washington Suburban Sanitary Commission (WSSC) deemed it necessary to construct and maintain a sludge composting facility on a certain tract of land in Prince George's County. It engaged in negotiations for the acquisition of the tract and standing timber thereon with the owners, Donald S. Nash and The National Bank of Washington, Trustees (Nash).[1] No agreement was reached.

On 22 August 1978 a contract was entered into between Nash and Earl Thompson and Shirley Thompson, trading as Thompson Lumber Company (Thompson), whereby Nash sold and Thompson bought all timber fourteen inches in diameter, measuring twelve inches from the ground, standing on the

---

1. Robert S. Nash, Donald S. Nash and The National Bank of Washington were the trustees under an unrecorded joint venture agreement dated 27 December 1960. Robert S. Nash died and Donald S. Nash and The National Bank of Washington are the surviving trustees, no successor trustee having been appointed.

tract for the sum of $200,000. The contract called for Thompson to cut and remove the timber. The contract expressed the understanding of the parties that upon its execution all of the described timber "shall belong, be owned and be the property of [Thompson]." It was agreed that all such timber would be removed by Thompson from three designated areas within certain specified times from the date of the execution of the contract, namely ninety days, six months and one year, respectively. Any timber not so cut and removed was to revert to and become the property of Nash at the end of each of the stated time periods for the designated areas. The contract was signed, sealed and acknowledged by the parties and duly witnessed and attested. It was recorded among the Land Records of Prince George's County on 23 August 1978.

On 1 September 1978 WSSC filed a petition for the condemnation of the land and standing timber thereon in the Circuit Court for Prince George's County, naming Nash and Thompson as defendants.[2] *See* Md. Code (1974), Title 12 of the Real Property Article; Md. Rules, ch. 1100, subtitle U. WSSC did not attempt to take the property immediately through a "quick take" procedure; it made no payment to Nash and Thompson or into court. Const. of Md. Art. III, § 40C.[3] *See*

---

2. The petition also named Robert S. Nash, Trustee, as a defendant. *See* footnote 1 *supra.*

3. Const. of Md. Art. III, § 40C, provides:

The General Assembly shall enact no law authorizing private property to be taken for public use without just compensation, to be agreed upon between the parties or awarded by a jury, being first paid or tendered to the party entitled to such compensation, except that where such property, located in Prince George's County in this State, is in the judgment of the Washington Suburban Sanitary Commission needed for water supply, sewerage and drainage systems to be extended or constructed by the said Commission, the General Assembly may provide that such property, except any building or buildings may be taken immediately upon payment therefor by the condemning authority to the owner or owners thereof or into the Court to the use of the person or persons entitled thereto, such amount as the condemning authority shall estimate to be the fair value of said property, provided such legislation requires that the condemning authority's estimate be not less than the appraised value of the property being taken as evaluated by at least one qualified appraiser, whose qualifications have been accepted by a Court of Record of this State, and also requires the payment of any further sum that may subsequently be awarded by a jury, and provided such legislation

Acts 1967, ch. 53; Prince George's County Code (1975), app. 1, ch. 2, § 2-1; Washington Suburban Sanitary District Code (1978), § 2-1, all implementing the constitutional authorization. At the request of WSSC, Thompson temporarily ceased cutting timber on the property. Thompson notified WSSC on 13 September, however, that the timber felling operation would be resumed. The next day, the Circuit Court for Prince George's County, upon petition of WSSC, ordered *ex parte* that Thompson "cease the cutting or removal, or causing the cutting or removal, of any trees upon the land" sought to be condemned, and to show cause why the order should not be made permanent. On 27 September, upon hearing, the court, by its order, dissolved the "temporary injunction" and denied the request for a "permanent injunction." WSSC countered by filing, the same day, a "Petition and Affidavit for Temporary Injunction and Show Cause Order." The matter was heard in open court, and on 6 October 1978, the court denied the petition. The same day WSSC noted an appeal to the Court of Special Appeals from the order of 27 September and the order of 6 October.

On 2 November 1978 WSSC filed in this Court a "Motion to Protect Res Pending Appeal." On 9 November, on our own motion, we ordered the case certified to us for review. We also, by our order, reinstated and continued the *ex parte* injunction issued by the Circuit Court for Prince George's County on 14 September, so that Thompson was enjoined "from cutting or removing or causing the cutting or removal of any trees or vegetative growth upon the lands which are described in the petition for condemnation ... pending the

---

limits the condemning authority's utilization of the acquisition procedures specified in this section to occasions where it has acquired or is acquiring by purchase or other procedures one-half or more of the several takings of land or interests in land necessary for any given water supply, sewerage or drainage extension or construction project.

In oral argument before us, WSSC stated that it was not sure whether "quick take" was available to it. It referred to the constitutional and statutory limitations on a quick taking with respect to "several takings of land or interests in land." As only one taking was necessary here, WSSC believed it questionable whether a "quick take" was authorized. In any event, it is clear that it made a considered decision not to proceed under the "quick take" procedure.

disposition by this Court of Appeals . . . or until further order of this Court. . . ."

The appeals were heard by us on 30 November 1978. The next day, for reasons to be set forth in an opinion to be filed later, we vacated our order of 9 November and affirmed the decree of the Circuit Court for Prince George's County dated 6 October 1978 denying WSSC's motion for a temporary injunction. We now give our reasons for this action.

The General Assembly has spelled out when property is deemed to be taken under the exercise of the power of eminent domain:

(1) If the plaintiff lawfully is authorized to take the property before trial pursuant to Article III of the Constitution of the state, or any amendment to it, and the required payment has been made to the defendant or into court, any required security has been given, and the plaintiff has taken possession of the property and actually and lawfully appropriated it to the public purposes of the plaintiff.

(2) In every other case, if the plaintiff pays the judgment and costs pursuant to Subtitle U of the Maryland Rules. [Md. Code (1974) § 12-102 of the Real Property Article].

See *Hardesty v. State Roads Comm'n,* 276 Md. 25, 343 A. 2d 884 (1975), in which there was a taking under "quick take" procedures. *Cf. Calvert Associates v. Department,* 277 Md. 372, 357 A. 2d 839 (1976). Here, there was no compliance by WSSC with either of the prescribed means of taking. Whether or not its reasons were sound, it decided not to proceed under its "quick take" power, and the three requisites of a taking under such procedure — payment made; security, if any required, given; and possession taken with actual appropriation to the public purpose — had not been fulfilled. And of course, the condemnation action WSSC pursued had not gone to trial, and there was no judgment and costs as yet to be paid.

The contract for the sale of the timber was executed and recorded before the action for condemnation was filed by

WSSC. At the time the contract for the sale of the timber was executed and recorded, WSSC had no rights of any kind in the land, including the timber standing thereon.[4] Nash was free to use it, enjoy it or dispose of it, or any interest in it, as Nash saw fit. WSSC instituted the condemnation action with full knowledge of the timber contract. The mere filing of the condemnation petition gave it no rights in the land. Nash was still free to use the land, enjoy it or dispose of it as before. WSSC attempted to obtain by the injunction control over the land to which it was then not entitled. The obvious purpose of the injunction sought, as was stated by WSSC in argument, was "to restrain the severance of the timber from the realty so that the timber might remain in place until such time as the trial was had and just compensation ... determined by the jury." This would seriously curtail the use of the property by Nash, the owner, and adversely effect the rights of Thompson under the timber contract. As WSSC conceded, the injunction would prohibit Thompson from

---

4. Prior to the enactment of the Maryland Uniform Commercial Code (UCC), now appearing in Md. Code (1975), Titles 1 through 10, the law of this State was uniformly to the effect that a sale of standing timber was a sale of goods. Willard v. Higdon, 123 Md. 447, 451, 91 A. 577 (1914); Wimbrow v. Morris, 118 Md. 91, 95-96, 84 A. 238 (1912); Whittington v. Hall, 116 Md. 467, 470, 82 A. 163 (1911); Leonard v. Medford, 85 Md. 666, 671, 37 A. 365 (1897); Smith v. Bryan, 5 Md. 141, 151, 59 Am. Dec. 104 (1853). Section 2-107 (1) of the UCC, however, declares:

> A contract for the sale of timber, minerals or the like or a structure or its materials to be removed from realty is a contract for the sale of goods within this title *if they are to be severed by the seller* but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell. (Emphasis added).

The Official Comment cautions:

> [T]his subsection applies only if the timber, minerals or structures "are to be severed by the seller." If the buyer is to sever, such transactions are considered contracts affecting land and all problems of the Statute of Frauds and of the recording of land rights apply to them.

Section 2-107 (3), according to the Official Comment, provides "a means of preserving the buyer's rights under the contract of sale." Subsection (3) states:

> The provisions of this section are subject to any third party rights provided by the law relating to realty records, and the contract for sale may be executed and recorded as a document transferring an interest in land and shall then constitute notice to third parties of the buyer's rights under the contract for sale.

taking possession of that for which they had paid and would interfere with the right to carry out the timber contract. In short, WSSC would obtain substantial dominion over the land, and Nash and Thompson would suffer severe interferences which would be tantamount to deprivations of their use and enjoyment of the property. In other words, by way of injunctive relief, WSSC would obtain substantial rights and benefits it would receive under a "quick take", but without incurring any of the obligations incident to that procedure. For example, it would not have to pay, at the time it obtained such control over the land through the injunction, the amount required upon a quick taking but could defer payment of any just compensation awarded until a judgment rendered upon trial became final. Code (1974) § 12-107 of the Real Property Article; Md. Rules U23 and U25. And it may well be, that after restricting Nash's use and enjoyment of the property for some time, WSSC could abandon the condemnation proceeding. Code (1974) § 12-109 of the Real Property Article; Md. Rule U26.

As we have indicated, provisions of the Maryland Constitution concerning the exercise of the sovereign power of eminent domain and their implementation as evidenced by the appropriate provisions of the Maryland Code, the Prince George's County Code, the WSSD Code and the Maryland Rules of Procedure, have established a precise scheme for the acquisition of land and interests in land by WSSC under eminent domain. It may acquire land and interest therein through the exercise of that power only for certain specific purposes under meticulously detailed procedures upon meeting clearly designated conditions. And the People of Maryland, in amending their constitution to permit the immediate taking of land by WSSC, and the Legislature in implementing the authority granted, were especially cautious that the power bestowed be so restricted that the rights of owners thus deprived of their property would be adequately safeguarded.

In the peculiar circumstances of this case, both the restraining order and the injunction which WSSC sought would have effectively thwarted the carefully devised

scheme. The trial court properly prevented this from occurring by denying WSSC's motions for the restraining order and the injunction. We, therefore, vacated our order of 9 November 1978 which had reinstated the trial court's *ex parte* injunction of 14 September 1978 prohibiting cutting and removal of the timber and affirmed the decree of the trial court denying the temporary injunction.[5]

---

5. We express no opinion whether WSSC had the power to "quick take" in the circumstances here. As we understand its position, it posited only for the purpose of decision on this appeal, that it did not have the power, as, in any event, it had chosen not to proceed under an immediate taking.

Furthermore, it does not necessarily follow from our holding on this appeal, which is predicated on the particular circumstances here existent, that injunctive relief would not be available in any case to prevent the destruction, misuse, or alienation of land or an interest therein to the detriment of the condemnor. Whether such relief would be appropriate is to be determined on a case to case basis upon a balancing of the rights of the condemnor with the rights of the condemnee.