## SOPHIE PETERSON AND OTHERS v. LOYAL SCHOBER AND OTHERS.[1]

August 10, 1934.

No. 29,876.

[1]Reported in 256 N. W. 308.

*Cobb, Hoke, Benson, Krause & Faegre, Claude G. Krause,* and *C. P. Randall,* for appellant.

*B. W. Wilder* and *Homer Morris,* for respondents.

*JULIUS J. OLSON, Justice.*

Defendant Apartment Owners Holding Company has appealed from an order of the district court of Mower county denying its motion for a new trial.

The case was tried to the court and a jury, but after the parties had rested and pursuant to consent of counsel the issues were submitted to the court for decision. The court made findings favorable to, and ordered judgment for, plaintiffs.

The defendants other than the present appellant are not parties to this appeal. Hereafter we shall refer to the holding company as defendant, and no reference will be made to the others.

One Henry N. Peterson departed this life January 21, 1901, intestate, being at that time a resident of Mower county, this state. He was survived by his wife, the plaintiff Sophie Peterson, and nine children. Thereafter such proceedings were duly had in and by the probate court of said county that on May 12, 1902, a final decree of distribution was issued by and out of said court. Under the terms thereof one-third of the residue of decedent's estate (at least in so far as the lands here involved are concerned) was vested in Sophie Peterson, and to each of the nine children an undivided 2/27ths thereof. On March 9, 1920, Sophie Peterson and eight of her children joined in executing a warranty deed to the premises here involved to one Seitz, conveying the undivided 25/27ths of said premises to him as grantee. The consideration stated in the instrument was $42,394.45. On April 5, 1920, the administratrix of the estate of one of the Peterson children who had died, pursuant to license and order of confirmation made by said probate court, executed an administrator's deed to the same property to the same grantee covering the remaining 2/27ths interest therein for a stated consideration of $1,630.55. On March 1, 1920, the purchaser

(Seitz) executed purchase money mortgages back to Sophie Peterson in the total sum of $31,000. The abstract discloses that thereafter two of the mortgages were foreclosed, and the property covered thereby was bid in at the sale in the name of Sophie Peterson. She apparently became the sole owner of the property by virtue of these foreclosures. Since Mrs. Peterson became repossessed of the property under her foreclosures she has been in possession of the premises through her tenant.

At all times hereinafter mentioned Mrs. Peterson was a resident of Hennepin county, residing with a widowed daughter, Eva Hearn. In the early part of the year 1930 Mrs. Peterson conferred with her children, and it was concluded that it would be desirable to dispose of the Mower county farm. The price at which the land was to be sold was to be at least $14,000, not less than half of which was to be paid in cash and the remaining half thereof within six months. At the time of trial of this action Mrs. Peterson was 73 years of age, inexperienced in respect of real estate transfers, and somewhat feeble. We assume that the farm was not productive of much income and was perhaps a burden to the owners. At any rate, the evidence clearly demonstrates that Mrs. Peterson and her children were anxious to dispose of this property and that the proceeds from its sale were needed by her for her comfort and requirements.

The defendant A. Melvin Whittle is a son-in-law of plaintiff Mrs. Peterson, having married the daughter Nora. Undoubtedly because of this relationship, with him was intrusted the responsibility of finding a buyer for this farm. No other sale or deal was talked of or considered by Mrs. Peterson or by any member of the family than upon a cash basis. No trade was mentioned or thought of.

Whittle got busy with his task of finding a buyer. He found one Anderson, who represented himself to be a dealer in real estate and particularly in trades. Through Whittle and Anderson, the defendant Schober came into the picture. He too was a dealer in real estate equities.

The defendants Arnt Bakke and the Apartment Owners Holding Company, including the president of the said company, one G. A.

Carlson, became interested in the deal through the efforts of Anderson, Schober, and Whittle. On February 21, 1930, Whittle, claiming to act in behalf of Mrs. Peterson, and G. A. Carlson, acting in behalf of the defendant holding company, entered into an exchange contract of properties. Under the terms thereof Mrs. Peterson was to convey the farm here involved to the defendant, free from encumbrances except current taxes, and was to receive in exchange therefor an equity in an apartment building located in south Minneapolis, owned by it, subject however to a first mortgage of $40,000 to be by her assumed "and other encumbrances not to exceed $3,950 and 1929 taxes"; also subject to certain easements. It does not appear that Mrs. Peterson was ever informed or knew anything about the making of this instrument; nor is any claim made that this instrument was entered into pursuant to any authority granted by her to Whittle. In fact she denies any knowledge of such arrangement.

Immediately thereafter Anderson, Carlson, and Bakke made a trip to Lyle, Minnesota, to inspect the farm. Finding the same satisfactory, it appears that the next step was the procurement of necessary conveyances. While the title of record stood in the name of Mrs. Peterson, yet it appears that the parties contemplated getting deeds from the children also. Just why this was thought desirable is not made clear in the testimony, but it may be assumed that perhaps Mrs. Peterson considered the children as having an interest in the farm. Perhaps she considered herself a trustee to the extent that the children had an interest in the farm as heirs at law of their deceased parent, Henry N. Peterson; their testimony points in that direction. At any rate, a form of warranty deed was prepared, to be signed by Mrs. Peterson and the children, including their respective husbands and wives. Whittle and Schober took the matter in hand on or about March 4, that being the date the instrument bears. The deed runs from the grantors, the present plaintiffs, to the defendant Apartment Owners Holding Company. The farm is described with particularity, and the consideration is stated to be "one dollar and other valuable considerations." The usual covenants of warranty appear. It is stated that the land is free

from all encumbrances except taxes for the year 1929. The conveyance is also made "subject to the rights of the tenant now living on the above described premises." The deed appears to have been acknowledged by the grantors March 14, 1930.

In addition to the warranty deed hereinbefore mentioned, there were several quitclaim deeds to be executed. Conrad Peterson, one of the Peterson children, lived in California. A quitclaim deed was sent to him for execution which he acknowledged on March 7 in that state. Phoebe Kahler, a daughter, and husband executed a quitclaim deed in Wisconsin. Mr. Carlson, one of the defendants, testified that there were several such quitclaim deeds to be executed, four or five of them altogether. He demanded a "complete title." These quitclaim deeds were evidently required by him as a condition precedent to the closing of the transfer.

Mrs. Peterson was assured, and it appears clearly from the testimony that it was the understanding of all the Peterson heirs when they signed these deeds, that $7,000 would be forthcoming at once and that the remaining $7,000 would be paid shortly thereafter, not exceeding a period of six months. Whittle and Schober got possession of the warranty deed, and the deal was to be carried out upon the basis mentioned, so Mrs. Peterson and her children thought. They had no other authority. Instead of getting any money it appears that Whittle and Schober received, ostensibly as agents for Mrs. Peterson and her children, a deed to the apartment building, a bill of sale covering certain personal property therein, and other instruments purporting to vest title in her pursuant to the exchange agreement hereinbefore mentioned. On March 15, 1930, Schober received from Sophie Peterson what is referred to as a "full power of attorney." In this instrument, witnessed by defendant Whittle and his wife, Nora, Schober was given full authority as her agent to handle her affairs in respect of the property known as Northome Apartments, that being the apartment building referred to in the exchange agreement. The authority so granted further provided that "any negotiations that may be necessary to properly finance the property are to be carried on by him for me and in my stead."

On April 11, 1930, there was secured from Mrs. Peterson an assignment of all rents and income from the apartment building to The Business Company, and as consideration for the assignment the assignee guaranteed payment of the $40,000 mortgage upon the apartment building. The evidence does not disclose what The Business Company is or who has the management thereof. The assignment was not recorded until October 4, 1930, and there is no proof or showing as to who caused it to be recorded. On the 20th of April Schober secured the execution on the part of Mrs. Peterson and his mother, Mrs. Mary L. Schober, of a contract for deed under the terms of which Mrs. Peterson agreed to convey the apartment building and the personal property therein for a stated consideration of $72,000. The contract recites that $14,000 was "in hand paid," and receipt thereof is acknowledged. For the balance of the purchase price the grantee assumed and agreed to pay the $40,000 mortgage upon the premises, and the remaining $18,000 was to be paid at the rate of $75 per month during the first three years plus interest at six per cent per annum; thereafter the payments were to be increased to $100 per month, interest at the same rate, until the whole of the purchase price should be paid in full. In addition thereto, the purchaser also was to pay all taxes and assessments levied upon the premises subsequent to the year 1929. Mrs. Peterson denies having signed any such instruments and asserts that she knows nothing about them and never heard of their existence until immediately before this case was commenced.

On June 5, 1930, Schober and Whittle induced Mrs. Peterson to execute a mortgage on the apartment building to the daughter Nora Whittle in the sum of $14,000, due five years thereafter. It was not recorded until November 19, 1930. By whom or at whose request it was placed on record does not appear. Mrs. Peterson testified that she knew nothing about this instrument, had no recollection of any such, nor did her children, until this action was commenced. Some of the children even testified they knew nothing about it until it was produced in court at the trial. Arthur Nelson, a son-in-law of Mrs. Peterson, testified that he talked with Schober and Whittle before he and his wife signed the deed and was told by Schober that

he (Schober) was selling the farm for $14,000 cash to a holding company.

Q. "And is that why you signed the deed?

A. "Yes, otherwise I wouldn't—"

Roy Kahler, also a son-in-law, testified that defendant Bakke told him that the holding company had paid Schober $500 "to put through this deal."

The daughter Mrs. Hearn testified that when she executed the papers they were promised that each of the parties was to get his respective share of the money. She refers to a conversation she had with defendant Bakke sometime during the summer of 1932.

Q. "What did Mr. Bakke say to you?

A. "Why, he wanted to know if we had ever received any money, and I said 'no,' and he said they had given a sum of around $1,000 or over to Mr. Schober to give to us, and he wanted to know if we had received it, and I said 'no.'"

Further on she testified that she did not know until the day of trial that a mortgage had been given by her mother to Nora Whittle.

Mr. Carlson, president of the defendant company, testified that Mr. Anderson saw him one day and asked whether or not he (Carlson) would be interested in exchanging an apartment building for a farm in southern Minnesota. This was in February, 1930. Shortly after that Mr. Bakke took Whittle and Schober over to Carlson's office and introduced them. This is the first time they had ever met. He also stated that he made an arrangement with Mr. Anderson to pay a commission to put this deal through. At that time Bakke was the manager of the Northome Apartments. Bakke, Carlson, and one Zekman were the original incorporators of the Apartment Owners Holding Company. Bakke had always been a stockholder therein. About a year prior to and at the time of trial he was secretary of the corporation. Zekman later sold his interest in the corporation to Carlson's wife. Carlson further testified that the apartment building originally cost $85,000 to build without the furniture and that the building was worth $65,000 at the time the deal was

made, that he had taken the property in upon a trade value of $75,000 some time prior thereto, and that monthly rental income therefrom was in excess of $1,000.

Before the deal was closed, according to his testimony, abstracts were furnished by each party to the other; that he gave to Mr. Anderson to be given to the plaintiffs the abstract covering the apartment building. Later on he testified that he was not interested with regard to the identity of Mrs. Peterson when he acquired the deed to her land; that he knew nothing about her or about what she really desired, claiming that he was dealing with Whittle and Schober as her agents.

The witness Anderson testified that he had met Mr. Schober some time prior to the occasion of his first conversation with respect to this deal at a friend's office. He says that he was informed by Schober that he, Schober, had some land in southern Minnesota that he wanted to exchange for an apartment building. This is what led him to enter into the deal, and that is how he came to be the agent for the defendant company. According to his testimony, he, Carlson, and Bakke went down and saw the farm shortly after the first meeting. He then took up the matter of getting the exchange through. He is the man who prepared the contract of exchange, handing it to Schober and Whittle for them to get it signed. It afterwards came back to him signed by Whittle as agent for Mrs. Peterson, and it was then turned over to Carlson for the defendant company to execute. He did not see Mrs. Peterson and knew nothing about her. He did not consider it his business. He handled his end of it, and the other broker was supposed to handle his. According to his testimony, he had never seen Mrs. Peterson and did not come in contact with Schober and Whittle until about February 15.

The evidence is conclusive that Mrs. Peterson, in fact all of the grantors of the farm property, have never received one cent in the way of income or otherwise from the apartment building. Mrs. Peterson testified that she knew nothing about any of these instruments except that she remembers she signed a deed and some "papers" at the time of the transfer. She intended only to transfer

the farm provided a purchaser was found who was willing and able to pay $7,000 cash and the remaining $7,000 not later than six months thereafter.

The court heard the evidence, had the opportunity of seeing the witnesses and of being able to appraise the value and worth of their testimony. Findings were made upholding plaintiffs' contentions. Provision was made in the findings for the entry of judgment substantially as follows: That all deeds transferring the Mower county farm to the Apartment Owners Holding Company be canceled and set aside and the title thereof be restored to the plaintiffs; that the plaintiff Sophie Peterson sign and deliver a quitclaim deed covering the Northome apartment to the defendant Apartment Owners Holding Company; that she also assign all her right, title, and interest in and to the rents and profits of said apartment building accruing since March 4, 1930, to said holding company; that the $14,000 mortgage to Nora Whittle be canceled and set aside; that the defendants deliver to plaintiffs the abstract of title covering the Mower county land; that if title cannot be restored in plaintiffs that plaintiffs have judgment against the defendants in the sum of $14,000.

The deed under which defendant claims title to the Mower county land appears among the files in this case. It has not been recorded. The abstract does not indicate that any conveyance has been recorded so as to in any way hinder or delay the vesting of the title in accordance with the court's order for judgment if the findings of the trial court are sustained.

Defendant has assigned 38 errors, which perhaps may be grouped and discussed as follows:

(1) Does the evidence warrant a finding of fraud directly traceable to the defendant or any of its officers or agents?

(2) Does the record require the conclusion that plaintiffs are estopped from denying the authority of those who had possession of the deeds to deliver the same to defendant?

(3) Does the record justify a finding that plaintiffs are guilty of laches requiring a denial of the relief granted by the trial court?

(4) Did the showing made by the defendant, on its motion for new trial in the court below in the matter of newly discovered evidence, require that the court, in the exercise of its discretion, should grant the same?

(5) Are there errors appearing in the record prejudicial to defendant's rights?

■ Defendant in its brief states:

"It is doubtless true that there was evidence upon which the trial court could base a finding that Sophie Peterson had verbally instructed her agent Whittle to deliver her deed to the farm only upon receipt of $7,000 in cash. It is also true that in one sense she may have been the victim of 'fraud' in that, if she did in fact give such instructions, he knowingly violated them."

The facts hereinbefore recited compel the conclusion that Mrs. Peterson and her children parted with title to a valuable farm, free from encumbrance and received nothing in return. That someone was guilty of fraudulent representations seems too clear for successful denial. But that question thus answered does not impose liability upon defendant unless the fraud practiced can be traced to it. Having in mind the many facts which point to the commission of fraud and the circumstances surrounding the entire transaction, it seems to be well within the province of the trier of fact to find that fraud was practiced by or in behalf of defendant in the procurement of the title papers. Admittedly, Anderson was the agent of the defendant company. He brought about an early meeting between Whittle and Schober and defendant Bakke, who was in charge of the defendant's building. Bakke as promptly brought these men into the picture with Anderson and Carlson, who directly represented defendant. Anderson, Bakke, and Carlson made a hurried trip to Lyle, Minnesota, to inspect the farm. Immediately thereafter Anderson got busy with the consummation of the deal. He is the man who prepared the contract for the exchange of the properties. Necessarily his work in this behalf was for his client, this defendant. He delivered the instrument to Whittle and Schober. The instrument came back without the signature of Mrs. Peterson

and without as much as the scratch of a pen emanating from her or from anyone authorized to act for her. It was signed by Whittle only, who assumed to act as her agent. Obviously and beyond doubt, this agreement was as to Mrs. Peterson and her children a mere nullity. The owner of real estate cannot be deprived of his right in respect thereof by any such arrangement as existed up to this point.

When this agreement had been signed by Mr. Carlson in behalf of defendant, the next step was the procurement of title papers. Mrs. Peterson and her children testified, as has been heretofore related, that the deed was executed with the express requirement and with the intention of not being delivered unless and until $7,000 in cash had been paid, with suitable arrangements in respect of the remaining $7,000 to be paid within six months. So the authority of Whittle and Schober, assuming that they were acting for plaintiff, was a limited one. Their agency was clearly limited to the finding of a purchaser. Such authority, being verbal only, does not confer upon the agent the authority to bind his principal to a conveyance. 2 Mason Minn. St. 1927, § 8459; La Plant v. Loveland, 142 Minn. 89, 92-93, 170 N. W. 920.

We have the further fact that Schober received from the defendant as commission $500 to "put through this deal." The record indicates clearly that Schober and Whittle knew all about Mrs. Peterson's needs and requirements.

The methods employed, as hereinbefore related, coupled with these further facts, viz.: That Schober procured a power unto himself from Mrs. Peterson granting him complete authority in all financial dealings respecting the apartment building; that there was also secured from her an assignment of all rental income from these apartments effective immediately upon closing of the trade; that Mrs. Peterson was prevailed upon to execute a $14,000 mortgage to her daughter Nora; that he (Schober) also procured from her a contract for deed running to his own mother reciting therein a cash consideration of $14,000, not a penny of which, however, has been paid to Mrs. Peterson—all convincingly establish a set purpose of fraud and overreaching and a combination of individuals to

effectuate that purpose. We cannot close our eyes to what must be obvious to any fair-minded individual presented with facts such as we have here. Added to the foregoing remains the further vital fact that Schober was rewarded for his services in the form of a $500 commission paid by defendant. How was that fee earned if it were not for services rendered in getting from Mrs. Peterson and her children a deed to this unencumbered and valuable farm?

It will not do for defendant to get away from the liability here attaching by asserting, as it does, that Bakke had no authority to speak for the corporation and that his admission of defendant's payment of a commission was inadmissible. Bakke was much more than a mere stockholder. At the time of trial and for nearly a year prior thereto he had been a director and secretary. Furthermore, he was in charge of the apartment building. To him Schober and Whittle went when they inspected the property. He took them promptly to Carlson and was present when the deal was being negotiated. He accompanied Carlson and Anderson on the trip to Lyle to inspect the property. He was to all intents and purposes a copartner in bringing about what was here accomplished.

We have no hesitancy in holding that the trial court was well within the evidence in finding that Schober was in fact the agent of defendant in respect of all of these negotiations.

"False representations by a third person having an indirect interest in the result of a particular transaction between others, by which one of the parties is injured and damaged by relying thereon, are actionable to the same extent as like false representations made by one of the parties. Where the representations so made are acted upon and the inducement to the contract, deceiving the party so acting thereon, good faith on the part of the person making them constitutes no defence to an action for the resulting fraud." 3 Dunnell, Minn. Dig. (2 ed.) § 3828a.

The same author in § 3830 has this to say:

"Where a contract is improvident and unfair, courts of equity have frequently inferred fraud from the mere disparity of the parties." (Cases under note 71.)

And further:

"The fact that the party defrauded is a woman inexperienced in business matters and the other party an experienced business man is a material consideration in determining fraud." (Cases under note 73.)

■ Defendant asserts that plaintiffs are estopped from denying the authority of those who had possession of the deed to deliver the same. Estoppel as such cannot be invoked by the defendant because it is not in fact a good faith purchaser of the property. The knowledge of Schober, in view of the facts and circumstances here appearing, became the knowledge of the defendant.

"Agency arises where the principal authorizes the agent to make engagements in the name of the principal" and "depends upon the will of the principal, either expressed or implied from the particular circumstances." Witzman v. Sjoberg, 164 Minn. 411, 412, 205 N. W. 257.

"When an agent is appointed for a particular purpose and authorized to do certain acts the liability of the principal for such acts depends upon (1) the power actually conferred; (2) the power reasonably necessary for the execution of those actually conferred; (3) the powers annexed by custom or usage; and (4) the powers in addition thereto which the principal by his words or conduct leads third persons reasonably to believe that the agent possesses." 1 Dunnell, Minn. Dig. (2 ed.) § 152.

■ For the same reason plaintiffs cannot be guilty of laches requiring a denial of the relief granted by the trial court. There can be no laches upon the facts here involved. Mrs. Peterson and her children knew nothing about the intricacies of this transaction until a day or two before the matter was turned over to Mr. Wilder as their attorney for the purpose of bringing about the relief here sought.

"Delay does not constitute laches unless it is culpable under the circumstances. * * * The practical question in each case is whether there has been such unreasonable delay in asserting a

known right, resulting in prejudice to others, as would make it inequitable to grant the relief sought." 4 Dunnell, Minn. Dig. (2 ed.) § 5351, and cases under note 77.

■ The defendant on its motion for new trial relies upon a number of affidavits, including one by Schober. Therein affiant states that he was acting as the agent for Mrs. Peterson; that he procured the power of attorney referred to heretofore and that he also prepared and Mrs. Peterson signed the contract for deed running to affiant's mother. Aside from the fact that lack of diligence fairly appears, we unhesitatingly say that this alleged new evidence, instead of being helpful to the defendant in this action, simply further establishes the fraud perpetrated by Schober upon Mrs. Peterson. The new matter is purely cumulative. It has little, if any, probative force.

Other affidavits relied upon were met by counter affidavits. A question of fact was presented to the trial court. We are satisfied that the court did not abuse its discretion in denying defendant's motion on this ground.

■ Various errors are referred to and relied upon by defendant for reversal. We need consider but the following:

(a) Objection was made to the admission of the testimony of the witness Roy Kahler wherein the admission of defendant' Bakke was testified to by him to the effect that Schober had been paid a commission of $500 by defendant for putting the deal through. Defendant asserts that this testimony should not have gone into the record for the reason that at the time the transaction took place Bakke was only a stockholder and not an officer of the corporation and that as such the admission was not admissible against it. In view of what we have heretofore stated regarding Bakke's interest and activity in respect of this particular deal for and in behalf of the corporation, coupled with the further fact that at the time of giving this testimony he was in fact an authorized officer thereof, we conclude that the evidence was properly admitted. The effect of an admission by one representing a corporation depends upon whether the individual has authority to speak for it. It is founded

upon agency. "It [agency] may be proved by circumstances such as the relation of the parties to each other and their conduct with reference to the subject-matter." 1 Dunnell, Minn. Dig. (2 ed.) § 149, and cases, note 83.

(b) Objection was also made to the testimony of Victor Peterson, a son of Sophie Peterson, with regard to the value of the Mower county farm. He had not seen the property for some 12 or 13 years but said he had kept in touch with it because it was a family matter. It also appears that he personally knew what the farm was, having been raised in the immediate vicinity. He described the land and the improvements and testified to what he considered its worth at the time the transaction took place. Witness's father acquired a part of this land in 1892 and the remainder in 1897. It was included in the final decree when the estate was probated. The witness had an interest in the property as an heir. He had been acquainted with it since childhood. We think the qualification of the witness was for the trial court to determine and that its ruling is not subject to criticism. Furthermore, it appears that both Carlson and Bakke inspected this farm in late February or the early part of March, 1930. Their inspection was for the purpose of determining its value. Carlson testified that the equity of the holding company in the apartment building was worth at least $20,000 and that the furniture therein was worth an additional $7,500. In defendant's motion for amended findings the court was asked so to find, and error is assigned for failing so to do. Defendant seeks in this action to acquire title to the farm in exchange for the apartment building and the personal property going with it. In view of this, it does not appear that the court was in error in determining that the farm was worth $14,000. Defendant is not required to take the farm over. It is only in the event that plaintiffs cannot be restored to ownership that defendant is required to pay the sum stated. The judgment to be entered is one canceling plaintiffs' deeds and reinvesting title to the Mower county farm in plaintiffs. The action was brought to rescind the deal and restore to the respective parties what they had parted with. The order for judgment is in conformity therewith.

Viewed from any angle, defendant's case is hopeless. Its claims are without merit. The learned trial judge reached an obviously just result, and the order appealed from must be and is affirmed.

